UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:25-mj-1717-NHA

RAYMOND MCJOHN

_____/

## RELEASE ORDER DENYING EXTRADITION

Chile seeks the extradition of United States citizen Raymond McJohn, so that he may be tried for offenses he allegedly committed in Chile in 2010 or 2011. Doc. 1. McJohn was charged in 2021, three years after a minor with the initials D.C.A.L. allegedly remembered, "[t]hanks to therapy and specialized help," the acts he committed against her eight years before.  Doc. 1; Doc. 1-1 p. 58. These acts allegedly included kissing her, touching her private parts, and digitally penetrating her. Doc. 1 ¶ 6f.

Chile seeks to extradite McJohn pursuant to the Treaty Providing for the Extradition of Criminals, U.S.-Chile, April 17, 1900, 32 Stat. 1850 (the "1900 Treaty"). Doc. 1-1 p. 3. The 1900 Treaty authorizes extradition for only certain enumerated offenses. *Id.* The enumerated offenses include "rape."  1900 Treaty, Art. 2(9).

The United States moves (1) to certify that McJohn is extraditable (Docs. 1, 14); (2) to detain McJohn pending his extradition (Doc. 3); and (3) to exclude evidence (a witness statement, photographs, and a polygraph) submitted by McJohn contradicting the victim's allegations (Doc. 20).

The parties have extensively briefed the issues before the Court (*see* Docs. 3, 14, 18, 19, 20, 27, 37, 38), and the Court has heard multiple arguments on the pending motions (Docs. 23, 34, 40).

Upon consideration of the record and the applicable law, the Court finds that McJohn's alleged offenses are not among those for which the 1900 Treaty authorizes extradition. The request to certify the extradition is, therefore, denied. The motions for detention and to limit the presentation of evidence are moot.

## I.    Background

McJohn worked as a schoolteacher at the Nido de Águilas School in Chile, from 2002 until 2016. Doc. 1-1 pp. 60, 131. During the 2010-2011 school year, D.C.A.L. was his student. Doc. 1-1 p. 11.

In 2016, McJohn retired with a personnel file that reflected a satisfactory job performance, and he moved to the Middle District of Florida. Doc. 1-1 pp. 60, 131; Doc. 18 p. 32.

Then, in June 2018, D.C.A.L. reported to her parents that she had been sexually abused by a relative. Doc. 1-1 p. 58. Her parents reported the abuse to the police, who ultimately closed the investigation. Doc. 1-1 p. 113. Thereafter, D.C.A.L.'s mental health deteriorated; she became suicidal and was hospitalized for mental health problems. Doc. 1-1 p. 55.

To address her mental health struggles, D.C.A.L. engaged in talk therapy. Doc. 1-1 p. 57. D.C.A.L. also underwent eight rounds of electroshock therapy, which her treating psychiatrist described as "a last measure" that "could lead to memory or memories loss, which can be permanent or temporary." Doc. 1-1 p. 229. The treatment was apparently highly unusual. Doc. 1-1 p. 229. (explaining that "if you must apply such therapy," it generally occurs over 3 sessions, but that D.C.A.L. had 8 sessions, and noting, "In my whole career, I have not seen a case in which a 14-year-old-teenager, must be treated with electro-convulsant therapy.").

D.C.A.L.'s mother reported that, "[t]hanks to therapy and specialized help," D.C.A.L. began to share that she had also been sexually abused by another person, McJohn. Doc. 1-1 p. 56. Specifically, D.C.A.L. alleged that, while working as her teacher in 2010 or 2011, McJohn would take her to a windowless "learning pod" where he rubbed his genitals over her skirt; touched

her genitals, breasts, and buttocks; kissed her on the mouth; and digitally penetrated her. Doc. 1-1 pp. 56, 226.

A. <u>Chilean Charges</u>

In 2021, three years after D.C.A.L. reported the allegations, the 4th Guarantee Court of Santiago accepted a criminal complaint against McJohn. Doc. 1-1 p. 51, 54–61. The Chilean government charged the Defendant with sexual abuse of a minor under 14 years old, in violation of Article 366 bis of the Chilean Criminal Code, and with aggravated sexual abuse of a minor under 14 years old, in violation of Article 365 bis, section 2, of the Chilean Criminal Code. Doc. 1-1 pp. 30, 54.

As to the sexual abuse charge, Section 366 provides that "Whoever performs a sexual act other than carnal access with a person under fourteen years of age shall be punished with a sentence of short-term imprisonment requiring labor, within its maximum range to long-term imprisonment requiring labor, within its minimum range." Chilean Criminal Code, § VI.366 bis.[1] The code defines "sexual acts" as "any relevant act of sexual significance carried out through bodily contact with the victim, or which has affected the victim's genitals, anus or mouth, even when there is no bodily contact with the

---

[1] McJohn submitted certified translations of the Chilean Criminal Code (Doc. 32), to which the government does not object. Doc. 34 (minutes) at 40:14–40:26.

victim." Chilean Criminal Code, § VI.365 bis. The Chilean Court charged Defendant with sexual abuse because of the allegations that he kissed the victim, touched her vagina and buttocks, and made the victim touch his genitals over his pants. Doc. 1-1 p. 70.

As to the aggravated sexual abuse charge, Article 365 provides that "If the sexual act consists of the introduction of objects of any kind, be it vaginally, anally or orally, or if animals are used in doing so, it shall be punished: . . . 2.-with long-term imprisonment requiring labor, within any of its ranges, if the victim was under fourteen years of age." Chilean Criminal Code, § VI.365 bis.[2] The Chilean Court charged the Defendant with aggravated sexual abuse due to the allegations that he inserted his fingers into D.C.A.L's vagina. Doc. 1-1 p. 71.

B. <u>Change in Extradition Treaties</u>

At the time McJohn allegedly committed the offenses, extradition between Chile and the United States was governed by the 1900 Treaty. Under the 1900 Treaty, a fugitive was extraditable from the United States to Chile only if he had been "charged with or convicted of any of the crimes and offenses

---

[2] This Article was added to the Chilean Criminal Code in 2004. Doc. 38-1 p. 3.

[specifically enumerated in the Treaty]. . . within the jurisdiction of [Chile]."[3] 1900 Treaty, Art. I. In other words, Under the 1900 Treaty, a person could not be extradited for an offense unless the offense was expressly listed in Article II of the Treaty. One offense listed in the 1900 Treaty was "rape."1900 Treaty, Art. II(9).

The United States characterized the approach taken by the 1900 Treaty as inflexible because it did not automatically account for the evolution of the criminal statutes in the two countries, but rather required "amend[ment] . . . as offenses [we]re criminalized by the Parties." S. FOREIGN RELS. COMM., EXTRADITION TREATY WITH THE REPUBLIC OF CHILE, S. EXEC. DOC. NO. 114-10, at 2 (2016).[4]

---

[3] The full sentence states, "The Government of the United States and the Government of Chile mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other."

[4] The 2013 Treaty also required countries to extradite their own nationals who committed or were accused of extraditable offenses, in contrast to "Article V of the 1900 treaty, which does not obligate a party to extradite its nationals." S. FOREIGN RELS. COMM., EXTRADITION TREATY WITH THE REPUBLIC OF CHILE, S. EXEC. DOC. NO. 114-10, at 2 (2016). The Senate noted that, under the 1900 Treaty "many countries of Latin America have, historically, refused to extradite nationals. The United States, by contrast, does extradite its nationals, and has long attempted to convince extradition partners to do likewise." *Id.*

In 2013, after McJohn allegedly committed the offenses, but before Chile charged him, the United States and Chile enacted a new extradition treaty, the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Chile, U.S.-Chile, June 5, 2013, T.I.A.S. No. 16-1214 (the "2013 Treaty"). The 2013 Treaty took a markedly different approach to designating crimes for which persons were subject to extradition. Rather than specifying the eligible offenses, the 2013 Treaty provided a formula for determining whether an offense made someone eligible for extradition: the offense must be punishable in both countries with a sentence exceeding one year. 2013 Treaty, Art. 2; *see also United States v. Herbage,* 850 F.2d 1463, 1465 (11th Cir. 1988) (distinguishing these two types of treaties).

C. <u>Extradition Efforts in Chile</u>

After discovering McJohn resided in Florida, Chile's Public Ministry asked the Appeal Court of Santiago to submit a request to Chile's Ministry of Foreign Affairs for McJohn's extradition from the United States. Doc. 1-1 p. 30.

In considering the extradition request, the Appeal Court of Santiago considered whether the Defendant was extraditable—*not under the 1900 Treaty*—but under the 2013 Treaty, which allows extradition when the offense with which a fugitive is charged "is punishable under the laws in both States

7

by deprivation of liberty for a maximum period of more than one year or by a more severe penalty," 2013 Treaty, Art. II; Doc. 1-1 p. 31. At a hearing attended by the prosecutor, a defense attorney, and the Public Ministry, the Chilean prosecutor successfully argued that McJohn was extraditable, because "the sentences for [the crimes with which McJohn was charged] exceed a year" in both Chile and the United States. Doc. 1-1 p. 31; *see also* Doc. 1-1 p. 16 (same analysis in the extradition request from the Appeal Court of Santiago to the Chilean Minister of Foreign Affairs).

No party disputes that, on these grounds, McJohn would be extraditable under the 2013 Treaty. It was based on the criteria established under the 2013 Treaty that the Appeal Court of Santiago submitted an extradition request to the Chilean Minister of Foreign Affairs. Doc. 1-1 pp. 9–21.

On July 21, 2023, the Embassy of Chile forwarded the request for extradition to the United States Department of State. Doc. 1-1 p. 3. However—in contrast to the extradition analysis by the Appeal Court of Santiago—the Chilean Embassy's cover letter stated that it sought extradition under the 1900 Treaty, *not* the 2013 Treaty. Doc. 1-1 p. 3.

All parties now agree that, because McJohn's alleged offenses were committed prior to 2013, his extradition is governed by the 1900 Treaty cited

by the Chilean Embassy, not the 2013 Treaty analyzed by the Appeal Court of Santiago.  Doc. 14 p. 12 n. 3; Doc. 18 p. 2.

### D.  Middle District Proceedings

Upon receiving the request from the Chilean Embassy, an attorney in the Office of the Legal Adviser for the United States Department of State was charged with seeking McJohn's extradition. Doc. 1-1 pp. 1–2. That attorney declared that the 1900 Treaty was the relevant treaty and, without further explanation, that the offenses for which McJohn was charged were covered by Article II(9) of the 1900 Treaty (which lists "rape" as an extraditable offense). Doc. 1-1 pp. 1–2.

The United States Attorney's Office attached the State Department attorney's declaration to the Complaint seeking McJohn's extradition and submitted it to this Court (Docs. 1, 1-1), agreeing that the Court should analyze the extradition under the 1900 Treaty (Doc. 14 p. 12). *See also* 2013 Treaty, Art. 22(3) ("The prior [1900] Treaty shall apply to all requests relating to offenses committed prior to the entry into force of this Treaty.").

Pursuant to the Complaint, the United States arrested McJohn and sought his detention and extradition. Doc. 3. McJohn opposed both his detention and his extradition. Doc. 18.

9

As to his detention, McJohn argued that he was neither a flight risk nor a danger to the community. He explained that he had no criminal history and had been living openly in Florida since the charges were made public. Doc. 18 pp. 8–10. He further argued that his advanced age (75) and poor health, Chile's delay in bringing the 15-year-old charges, and the circumstances of the accusation all constituted extraordinary circumstances making detention inappropriate. Doc. 18 p. 9. He asserted that conditions of release, including his own voluntary travel to Chile, could be fashioned to ensure his appearance before the Chilean court and the safety of the community. Doc. 18 p. 10.

As to the United States' request for extradition, McJohn argued that the offenses with which he was charged were not extraditable, because they did not constitute "rape" as required for extradition under the 1900 Treaty. Doc. 18 pp. 3–5. Further, even if they were extraditable, the Court lacked probable cause to find that McJohn committed them. Doc. 18 pp. 5–8. In support of the latter argument, McJohn offered his own polygraph test (denying that he committed the crimes), photographs showing that there was no windowless or secluded learning pod as D.C.A.L. described, and a character statement from the person who worked as his co-teacher during the period the crimes were committed. Doc. 18 pp. 14–30.

The Court set an extradition hearing for July 22, 2025. Doc. 23. In anticipation of the hearing, the United States moved to exclude from consideration the evidence (the written statement, photographs, and polygraph) McJohn had submitted. Doc. 20.

At the hearing, the Court identified the inconsistencies in the treaties that the Chilean authorities invoked for McJohn's extradition and directed the United States to clarify (1) which treaty Chile relied on for authority to extradite McJohn, and (2) whether the Chilean authorities opposed McJohn's proposed conditions of release. Doc. 25. In response, the United States conveyed that (1) the Chilean Embassy sought extradition pursuant to the 1900 Treaty and—without further explanation—that the Chilean authorities viewed the Defendant as extraditable under Article II(9) of that treaty; and (2) that Chilean authorities did not agree to the proposed conditions of release. Doc. 27-1.

The Court held a second hearing on August 14, 2025, on the issue of the 1900 Treaty's application to the charged offenses. Doc. 34.  The Court noted

that Chile defined[5] (1) "rape" as an act involving "carnal access,"[6] *see* Chilean Criminal Code, § V.361, 362; (2) sexual abuse as "a sexual act *other than* carnal access,"[7] Chilean Criminal Code, § VI.366 bis (emphasis added); and (3) aggravated sexual abuse as abuse involving "introduction of *objects* of any kind, be it vaginally, anally or orally," into a minor under 14,[8] Chilean Criminal Code, § VI.365 bis.

    For this reason, the Court invited the parties to present evidence and argument relating to how Chilean law defined "carnal access" (required for rape under Chilean law), and the basis on which the United States Department

---

[5] Again, McJohn submitted certified translations (Doc. 32), to which the government does not object. Doc. 34 (minutes) at 40:14–40:26.

[6] Rape falls within Section V of the Chilean Criminal Code. The Code defines rape as (1) "carnal[] access[ of] a person over the age of fourteen, be it vaginally, anally or orally . . . when force or intimidation is used[,] . . . [w]hen the victim is unconscious, or when their inability to resist is taken advantage of[,] [or] . . . [w]hen the victim's mental incompetence or disorder is abused" or (2) "carnal[] access[], be it vaginally, anally or orally, [of] a person under fourteen years of age . . . even if none of th[ose] circumstances . . . apply." Chilean Criminal Code, § V.361, 362.

[7] Article 366 defines sexual abuse as follows: "Whoever performs a sexual act *other than carnal access* with a person under fourteen years of age shall be punished with a sentence of short-term imprisonment requiring labor, within its maximum range to long-term imprisonment requiring labor, within its minimum range." Chilean Criminal Code, § VI.366 bis. (emphasis added).

[8] Article 365 bis. defining aggravated sexual abuse, provides, "If the sexual act consists of the introduction of objects of any kind, be it vaginally, anally or orally, or if animals are used in doing so, it shall be punished: . . . 2.- with long-term imprisonment requiring labor, within any of its ranges, if the victim was under fourteen years of age." Chilean Criminal Code, § VI.365 bis.

of State attorney and Chilean Embassy had concluded that the Defendant's alleged conduct—for which he was charged with sexual abuse and aggravated sexual abuse—constituted the extraditable offense of "rape." Docs. 31, 34. Following the hearing, the Court invited the parties to submit additional briefing. Doc. 33.

The parties appear to agree that the Chilean Criminal Code does not define carnal access. *See* Doc. 1-1 p. 71 n. 4 (relying on a court decision to distinguish sexual abuse from rape); Doc. 37 (relying on materials outside the code for the meaning of carnal access).

Following the hearing, in support of his argument that rape required penetration by a penis, McJohn submitted (1) the definition of "acceso carnal" from the Pan Hispanic Dictionary of Legal Spanish ("Introduction of the penis into the vagina, anus or mouth of the victim" and excluding "introduction of objects or of other parts of the perpetrator's body") (Doc. 37 p. 6); (2) a decision from the Republic of Chile Constitutional Court in which the Court notes that women cannot "carnally access" (Doc. 37 p. 23); and (3) the opinion of Angelica del Pilar Torres Figueroa, a Chilean legal scholar, stating that "there is unanimity in the national doctrine and jurisprudence with respect to the fact that [carnal access] implies the introduction of the penis, and not any other

part of the body or an object, into the mouth, anus or vagina of the victim" (Doc. 37 p. 60).

Significantly, the United States submitted documents conceding that (1) Chile's definition of rape did in fact require penetration by the sexual organ of the offender, and (2) penetration using objects, including fingers, constituted the separate crime of "sexual assault" or "sexual abuse." Doc. 38-1 p. 3 n. 1; *see also* Doc. 1-1 p. 71 n. 4.

The United States also did not contest that McJohn was charged with "sexual abuse" and "aggravated sexual abuse," rather than "rape," and that he was accused of penetration with his fingers rather than his sexual organ. *See* Doc. 38-1; *see also generally* Doc. 1-1.

Nevertheless, the United States argued that the 1900 Treaty authorized McJohn's extradition. The United States relied on (1) the assertion by the Chilean Embassy and the United States Department of State that the 1900 Treaty authorized extradition, (2) the great deference the Court must afford to those authorities' interpretation of treaties, and (3) the liberal interpretation the Court must give to treaties. Doc. 38.

As evidence of the first point, the United States submitted a letter suggesting that Chilean legal authorities believed the charges against McJohn were extraditable offenses under the 1900 Treaty. Doc. 38-1. Curiously, the

September 5, 2025 letter said that "[t]his point was widely debated before the competent Chilean Court" and described the prosecutor's arguments for why the charges "would fall under the category of 'rape' for the extradition treaty, even though they are conceptually separated in the Chilean Criminal Code."[9] Doc. 38-1 p. 2.

The Chilean letter also stated that the Court of Appeals would amend its ruling to reflect that the extradition was permissible under the 1900 Treaty (rather than the 2013 Treaty it previously cited) and that it was "expecting to have a ruling soon" which it would work "hastily" to transmit through the proper channels. Doc. 38-1 p. 4.

First, this Court has some difficulty reconciling the letter's description of the debate that preceded the decisions of the Chilean courts with the record submitted to this Court. The record before this Court includes a statement by the Appeal Court of Santiago demonstrating that, at a hearing attended by the prosecutor, a defense attorney, and the Public Ministry, the Chilean court

_____

[9] The arguments cited acknowledged that sexual assault was "conceptually separated" from rape under the Chilean Criminal Code, but asserted that it belonged "under the *category* of 'rape' [in] the extradition treaty" because (1) both laws protect the right to sexual integrity, (2) the punishment is essentially the same, (3) the defined conduct is similar ("one being the carnal accession of the victim against their will . . . and the other the forced accession of any object against the victim's will"), and that, therefore, (4) both punished different aspects of what would be a wider (uncited and apparently uncodified) definition of rape. Doc. 38-1 (emphasis added).

examined the applicability of only the 2013 Treaty to the offenses. Doc. 1-1 p. 31.

Second, as to the forthcoming authority from the Chilean court, this Court held a status conference on September 25, 2025, to ask about (1) the estimated time in which it might receive the amended ruling from the Chilean court, and (2) any additional explanation of the basis for the Department of State's determination that the alleged crimes were extraditable under the 1900 treaty. Doc. 40. The government indicated that "what is to come will not provide any more evaluation regarding the conduct constituting rape." Doc. 40 (minutes) at 2:00–2:21. And, as of today's date, no amended ruling or further basis has been presented to this Court.

## II.    Standard of Review

No party disputes the law governing this Court's review of the case.[10] Extradition treaties create a binding obligation on the United States to surrender a fugitive to its treaty partner once it determines that the fugitive is extraditable. *See Wright v. Henkel*, 190 U.S. 40, 62 (1903). A fugitive may be deemed subject to extradition when: (1) the deciding judicial officer is authorized to conduct the extradition proceeding; (2) the deciding court has jurisdiction over the fugitive; (3) the extradition treaty is in full force and effect

---

[10] *See* Doc. 3 pp. 9–10; Doc. 14 pp. 6–7; Doc. 18 p. 2.

16

as to the crimes charged; (4) the applicable treaty covers the crime(s) of which the fugitive is accused; and (5) probable cause supports the charges. *See* 18 U.S.C. § 3184; *In Re Extradition of Wallace*, 543 F. Supp. 3d 1296, 1301 (M.D. Fla. 2021).

### III.    Analysis

The parties agree that (1) the undersigned is authorized to conduct the extradition hearing, (2) this Court has jurisdiction over McJohn, and (3) the 1900 extradition treaty between the United States and Chile is in full force and effect as to the offense charged here. Doc. 18 at p. 2. The parties disagree, however, on (4) whether the 1900 Treaty authorizes extradition for the alleged offenses; and (5) whether probable cause supports the charges.  Doc. 18 at p. 2.

A. <u>The undersigned is authorized to conduct the extradition proceeding.</u>

Extradition proceedings may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Magistrate judges in this District are authorized to handle extradition matters. *See* M.D. Fla. L.R. 1.02; *In Re: Administrative Orders of the Chief Judge*, No. 3:21-mc-1-TJC, Doc. 157 (Second Amended Order Re: Utilization of Magistrate Judges) (stating that a magistrate judge may conduct proceedings and enter an order concerning "[a] complaint

regarding extradition and a related warrant. 18 U.S.C. § 3184."). Thus, as the parties agree, the undersigned is authorized to conduct this extradition proceeding.

B. <u>This Court has jurisdiction over McJohn.</u>

The Defendant was arrested within the jurisdictional boundaries of the Middle District of Florida; therefore, the Court has jurisdiction over him. 18 U.S.C. § 3184; *see also Pettit v. Walshe*, 194 U.S. 205, 216 (1904) (providing that a marshal is required to bring a foreign fugitive sought for extradition before a "proper officer in the state where he was found").

C. <u>The 1900 Treaty is in full force and effect as to the charged crimes.</u>

The Eleventh Circuit has stated that the question of whether a treaty is in force "is in its nature political and not judicial" and, thus, a Court should not "interfere with the conclusions of the political department in that regard." *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004) (citations omitted).

The United States attaches to the extradition package a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State attesting that "the relevant and applicable treaty provisions in full force and effect between the United States of America and the Republic of Chile are found in the [1900 Treaty]." Doc. 1-1 p. 1 ¶ 2.

18

Indeed, while there is a more recent treaty between the United States and Chile (the 2013 Treaty), that treaty states, "Upon the entry into force of this Treaty, this Treaty shall supersede the [1900 Treaty] *with respect to all requests involving offenses committed on or after the date of this Treaty's entry into force*. The [1900 Treaty] shall apply to all requests relating to offenses committed prior to the entry into force of this Treaty." 2013 Treaty, Art. 22 (emphasis added). In other words, the 2013 Treaty does not supersede the 1900 Treaty as to offenses committed before the 2013 Treaty's enactment. The 1900 Treaty remains in full force and effect as to those offenses, which include those, like the ones here, alleged to have been committed in 2010 or 2011.

The Court accepts the conclusion of the executive branch that the 1900 Treaty between the United States and Chile is in full force and effect.

D. <u>The 1900 Treaty does not authorize extradition for the offenses here.</u>

As to whether the 1900 Treaty authorizes extradition for the offenses at issue—"sexual abuse" and "aggravated sexual abuse"—the parties do not dispute the following:

First, the 1900 Treaty–and not the 2013 Treaty – applies in this action.[11] Doc. 1-1 pp. 1–2; Doc. 18 p. 12.

---

[11] McJohn does not appear to contest that he would be extraditable under the 2013 Treaty. *See* Doc. 40 (minutes) at 10:30–10:50.

Second, the 1900 Treaty enumerates specific "crimes and offenses" which are the only ones for which a fugitive may be extradited. 1900 Treaty, Arts. I, II; Doc. 14 p. 13, Doc. 18 p. 3.

Third, the only enumerated offense in the 1900 Treaty that is arguably applicable to the charges against McJohn is "rape." Doc. 1-1 pp. 1–2, Doc. 18 p. 3.

Fourth, McJohn is not charged with rape but, rather, with sexual abuse and aggravated sexual abuse. Doc. 1, Doc. 18 pp. 3–4, Doc. 38-1.

Fifth, under Chilean law, rape means penetration with a sexual organ.[12]

---

[12] In support of this conclusion, McJohn proffers (1) the definition of "acceso carnal" in the Pan Hispanic Dictionary of Legal Spanish ("Introduction of the penis into the vagina, anus or mouth of the victim" and excluding "introduction of objects or of other parts of the perpetrator's body") (Doc. 37 p. 6); (2) a decision from the Republic of Chile Constitutional Court in which the Court notes that women cannot "carnally access" (Doc. 37 p. 23); and (3) the opinion of Angelica del Pilar Torres Figueroa, a Chilean legal scholar, stating that "there is unanimity in the national doctrine and jurisprudence with respect to the fact that [carnal access] implies the introduction of the penis, and not any other part of the body or an object, into the mouth, anus or vagina of the victim" (Doc. 37 p. 60).

The government does not dispute that rape requires penetration with a sexual organ. Doc. 38-1, p. 3 and n. 1 ("Rape is defined in Article 361 of the Chilean Criminal Code as penetration" and "'Penetration,' used in Spanish, should be understood only for sex organs of the offenders. I [sic.] any other situation, where it would be called 'sexual assault' or 'sexual abuse', the concept of 'penetration' is replaced for 'introduction' of any other objects, which includes the use of fingers.").

Sixth, there are no allegations in the Complaint or extradition package suggesting that the Defendant penetrated the victim with his sexual organ. *See generally* Doc. 1-1; Doc. 18 pp. 4–5.

Nonetheless, the United States asks the Court to find that the 1900 Treaty covers the alleged offenses of "sexual abuse" and "aggravated sexual abuse," based on (1) a recent decision by the Second Circuit in *Gomez v. United States*, 140 F.4th 49, 54–57 (2d Cir. 2025) that a court should look to the fugitive's underlying conduct–rather than the title of his formal charges–to determine whether he is extraditable under a treaty that enumerates specific offenses (Doc. 19); and (2) deference to the governments of Chile and the United States' statements that the crimes are extraditable under the 1900 Treaty, combined with a liberal interpretation of the 1900 Treaty (Docs. 14, 38). I examine each argument in turn.

### 1. The *Gomez* Decision

The United States offers for the Court's consideration the Second Circuit's opinion in *Gomez v. United States*, 140 F.4th 49 (2d Cir. 2025). Doc. 19. *Gomez* decided as a matter of first impression under what circumstances extradition is permissible when the underlying conduct is charged by a name not expressly listed in a treaty's enumerated extraditable offenses. *Gomez*, 140 F.4th at 57.

In *Gomez*, as in this case, the defendant was charged with "sexual abuse" but the foreign government (in *Gomez*, Ecuador, but here, Chile) sought to extradite the defendant under the enumerated extraditable offense of "rape." 140 F.4th at 52, 54; *see also* Doc. 1 ¶ 4; Doc. 1-1 at p. 1 ¶ 5 and p. 3.

The Second Circuit acknowledged that "the crime for which extradition is sought [must] be one provided for by the treaty between the requesting and the requested nation" but that "this inquiry becomes complicated when the treaty identifies the extraditable offenses by reference to a list of certain crimes." 140 F.4th at 55. While lower courts generally agreed that the crime charged need not be a "mirror image" of one listed in the treaty, the lower courts had, until then, taken two different approaches to determining when a treaty applied to a crime charged by a different name. *Id.* Some courts "examine[d] the allegations contained within the requesting country's extradition submissions to determine whether, based on the conduct alleged, there [wa]s probable cause to believe the fugitive committed one of the offenses listed in the treaty," an approach known as the "underlying conduct test." *Id.* Other courts employed the "essential elements test," instead examining "whether the crime charged and the treaty offense share[d] the same essential elements." *Id.* (citation omitted).

22

Following the Supreme Court's admonition that "if [an extradition] treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred," the Second Circuit concluded that the underlying conduct test was the proper approach. *Id.* at 56 (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933)). Thus, it held that "extradition is permissible when the underlying conduct constitutes an extraditable offense listed in the relevant treaty." *Id.* at 57.

Turning to the facts at issue in the *Gomez* case, under Ecuadorian law, the crime of rape (although not the crime of sexual abuse with which the defendant was charged) requires "carnal access," that is, penetration by the sexual organ of the offender. 140 F. 4th at 55 n. 1.[13] Significantly (and in

---

[13] The government argued at the August 14, 2025 hearing that the *Gomez* Court, in considering the definition of rape under the *treaty*, relied on the United States' definition of rape rather than that of Ecuador. Doc. 34. However, a review of the underlying record in *Gomez* confirms that, in considering whether the crime was extraditable under the treaty, the *Gomez* court was considering the elements of rape under Ecuadorian law. *See Gomez v. United States*, Case No. 25-386(cv) (2d. Cir. 2025), Doc. 30.1 p. 13; *see also Lalama Gomez v. United States*, No. 24-CV-7850 (CBA), 2025 WL 458260, at *2 (E.D.N.Y. Feb. 11, 2025), *aff'd sub nom. Gomez v. United States*, 140 F.4th 49 (2d Cir. 2025) ("The 1873 United States-Ecuador treaty provides for extradition for '[t]he crime of rape,' and the 1941 supplementary treaty provides for extradition for attempted rape[.] Under Ecuadorian law, rape may be committed with the introduction, vaginally, or anally, of objects, fingers, or organs other than the virile member, to a person of either sex[.]' The alleged

contrast to the facts here) the parties in *Gomez* agreed that the penetration element of rape *under Ecuadorean law* would be satisfied if the defendant solely engaged in digital penetration. *Id.* Therefore, because the United States had submitted evidence that the defendant had digitally penetrated the victim, "there [wa]s probable cause to believe that [the defendant] engaged in conduct that constitute[d] the extraditable offense of rape" under Ecuadorian law, and the defendant could be extradited to Ecuador. *Id.* pp. 55, 57–58.

Applying the test adopted in *Gomez* and urged by the United States in this case (Doc. 19)—"that extradition is permissible when the underlying conduct constitutes an extraditable offense listed in the relevant treaty"—McJohn is not subject to extradition. 140 F. 4th at 57. The parties agree that, under Chilean law,[14] rape requires penetration with a sexual organ. Docs. 37,

---

conduct in this case includes Lalama Gomez 'putting his fingers in [the victim's] anus and vagina.'" (citations omitted)).

[14] I consider the definition of rape under Chilean law because the 1900 Treaty provides that a fugitive is extraditable from the United States to Chile only if he has been "charged with or convicted of any of the [specifically enumerated] crimes and offenses . . . within the jurisdiction of one of the contracting parties." 1900 Treaty, Art. I. Here, it is alleged that McJohn committed the offense within the jurisdiction of Chile. While the government argues, "McJohn is extraditable if the alleged criminal conduct presented in Chile's extradition request constitutes 'rape,' as that crime is understood in U.S. law" (Doc. 38 p. 14), that position is undermined by the plain language of the statute which, as explained *infra*, controls. *Garcia-Godos v. Warden*, No. 20-13090, 2021 WL 1561352, at *4 (11th Cir. Apr. 21, 2021) (citing *United States v. Duarte-Acero*, 208 F.3d 1282, 1285 (11th Cir. 2000)) ("If the language

38-1. The parties also agree that nothing in the record suggests McJohn penetrated D.C.A.L. with a sexual organ. Docs. 1-1, 18, 38-1. Thus, McJohn's alleged conduct does not constitute rape under Chilean law and, therefore, the 1900 Treaty does not authorize his extradition under the *Gomez* test.

### 2. Deference

The United States' remaining argument is that I should defer to the assertions of the State Department and the Foreign Ministry of Chile (Doc. 1-1 p. 1 ¶ 5, p. 3) that McJohn's conduct is extraditable under the 1900 Treaty.

Indeed, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982); *see also United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is entitled to great deference.") (citations omitted).

---

of the treaty is clear and unambiguous, [the Court must] apply the words of the treaty as written."). Moreover, other courts have looked to the law of the foreign jurisdiction in which the defendant is charged to decide if the defendant is extraditable under the relevant treaty. *Ex Parte Davis*, 54 F.2d 723, 724 (9th Cir. 1931) (analyzing Mexican law to determine whether the defendant was extraditable when he had been accused of "manslaughter" but the treaty made "murder" extraditable); *see also Gomez v. United States*, 140 F. 4th at 55 n. 1; *Lalama Gomez v. United States*, No. 24-CV-7850 (CBA), 2025 WL 458260, at *2 (E.D.N.Y. Feb. 11, 2025), *aff'd sub nom. Gomez v. United States*, 140 F.4th 49 (2d Cir. 2025) (looking to the law of Ecuador, not the United States, to determine if the offense fell within the extradition treaty).

However, those agencies' opinions are not dispositive. Rather, the plain language of a treaty, not an agency's reading of it, is the starting point for the Court's treaty interpretation. *United States v. Alvarez–Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, [courts] first look to its terms to determine its meaning."); *see also Air France v. Saks*, 470 U.S. 392, 399 (1985) (explaining it is the Court's "responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."). Thus, "[i]f the language of the treaty is clear and unambiguous, [the Court must] apply the words of the treaty as written." *Garcia-Godos v. Warden*, No. 20-13090, 2021 WL 1561352, at *4 (11th Cir. Apr. 21, 2021) (citing *United States v. Duarte-Acero*, 208 F.3d 1282, 1285 (11th Cir. 2000)).

Thus, when the State Department's interpretation of a treaty conflicts with the treaty's clear language, deference to the State Department does not authorize the Court to overwrite the language of the treaty. *United States v. Alvarez–Machain,* 504 U.S. 655, 687 n. 35 (1992) (collecting cases) (Stevens, J., dissenting) ("That the Executive may wish to reinterpret the Treaty to allow for an action that the Treaty in no way authorizes should not influence this Court's interpretation"). Indeed, courts, including the Supreme Court, have repeatedly rejected the State Department's interpretation of a treaty in favor

26

of its plain language. *See, e.g., Perkins v. Elg*, 307 U.S. 325 (1939) (construing treaty in accordance with historical construction and refusing to defer to the State Department's more recent policy favoring a different construction); *Johnson v. Browne,* 205 U.S. 309 (1907) (rejecting the Canadian government's interpretation of a treaty because it was undermined by the plain language of the treaty); *Matter of Extradition of Wallace*, 543 F. Supp. 3d 1296, 1307 (M.D. Fla. 2021) (finding, contrary to the government's argument, that the defendant could not be extradited "because the prosecution for the offense of which extradition is sought has become barred by lapse of time according to the laws of the United States"); *United States v. Bilic*, 625 F. Supp. 3d 1214, 1232 (D. Utah 2022) (rejecting the State Department's interpretation that a defendant was extraditable based on the facts surrounding the defendant's alleged extraditable offense); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *6 (M.D. Fla. May 8, 2003) (rejecting the United States government's contention that the defendants conduct met the dual criminality standard); *Matter of Doherty by Gov't of United Kingdom of Great Britain & N. Ireland*, 599 F. Supp. 270, 277 (S.D.N.Y. 1984) (rejecting the United Kingdom's interpretation of treaty's carve out for political offenses).

Here, the United States provided the Chilean Foreign Ministry's and the State Department's conclusions that McJohn's alleged conduct constituted the

27

enumerated offense of "rape" under the 1900 Treaty. Doc. 1-1 p. 1 ¶ 5, p. 3. The Court repeatedly solicited information or guidance that would assist the Court in understanding the bases for their conclusions. *See* Docs. 31 (seeking "the basis on which the United States Department of State attorney and Chilean Embassy concluded that the Defendant's alleged actions fell within the extraditable offense of 'rape'"); Doc. 34 (seeking this information at the August 14, 2025 hearing); Doc. 40 (inquiring whether any bases will be forthcoming).

In response, the United States procured a letter from the Chilean Foreign Ministry describing an argument made by the prosecutor that the 1900 Treaty provided for the Defendant's extradition. Doc. 38-1 ("This point was widely debated before the competent Chilean Court, within the context of the extradition ruling. Both the Prosecutor and the Defendant were aware that . . . the extradition request would be filed under the 1900 [Treaty] . . . ." In the debate before the competent court, the prosecutor argued . . . ."). However, this Court does not have in the record material consistent with that description. The record currently before this Court shows that the Chilean Court system found (in contradiction to both parties' current position on the issue) that the 2013 Treaty applied to the request (Doc. 1-1 pp. 16, 31, 52) and, at the a hearing attended by the prosecutor, a defense attorney, and the Public Ministry, the parties applied the test from the 2013 Treaty, noting "the sentences for [the

crimes with which the Defendant was charged] exceed a year" in both Chile and the United States (Doc. 1-1 p. 31).

Moreover, the letter itself, even when given tremendous deference, does not provide a basis on which the Court could find that McJohn is subject to extradition. The letter does not argue that McJohn's acts constituted rape as defined under Chilean law. *See* Doc. 38-1 p. 2 and n. 1. Instead it asserts that rape under Chilean law requires penetration by a sexual organ (Doc. 38-1, p. 3 n. 1), but that McJohn's conduct falls under the "category" of rape (Doc. 38-1 p. 2) for a number of reasons.[15]

But this Court has authority only to interpret the law as it is written. It may not refashion the law to effect a more desirable outcome. Thus, it cannot expand the 1900 Treaty to apply to, not just the expressly enumerated crimes, but also to broad categories of similar crimes.[16]

---

[15] The reasons given are that (1) both protect the right to sexual integrity, (2) the punishment is essentially the same, (3) the defined conduct is similar ("one being the carnal accession of the victim against their will . . . and the other the forced accession of any object against the victim's will"), and (4) both punish different aspects of what would be a wider definition of rape. Doc. 38-1 pp. 2–3.

[16] The government has not offered any evidence from the negotiations of, or the historical interpretation of, the 1900 Treaty, to support its position that the treaty applies to categories of similar crimes. *See Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991) ("[T]reaties are construed more liberally than private agreements, and to ascertain their meaning [courts] may look beyond the written words to the history of the treaty, the negotiations, and the

The 1900 Treaty lists specific "crimes and offenses" for which fugitives may be extradited, rather than "categories" or "types" of crimes and offenses. 1900 Treaty, Art. 1 ("charged with or convicted of any of the crimes and offenses *specified* in the following article" (emphasis added)); *see also Gomez*, 140 F. 4th at 57 ("[E]xtradition is permissible when the underlying conduct constitutes an extraditable *offense* listed in the relevant treaty." (emphasis

_____

practical construction adopted by the parties." (internal quotation marks omitted)).

And, to the extent the government proffers case law suggesting this Court should use a "generic" or "categorical" definition of each treaty offense (Doc. 38 pp. 9–10), that case law does not support the government's argument. Rather these cases use the *Gomez* test—"that extradition is permissible when the underlying conduct constitutes an extraditable offense listed in the relevant treaty," *Gomez*, 140 F.4th at 57. *See Collins v. Loisel*, 259 U.S. 309, 312 (1922) (finding the defendant was extraditable to India when an affidavit charged the defendant with "cheating," even though the relevant treaty listed a different crime of—"obtaining property under false pretenses"—because the accusations against the defendant brought by the Indian court included that the defendant "feloniously obtained [a] pearl button by false pretenses"); *Cordero- Rezabala v United States*, No. 24 Civ. 4010, 2024 WL 1673366, at *3-4 (D.N.J. Apr. 18, 2024) (finding that the defendant was extraditable to Ecuador when the treaty made extraditable attempted rape and, although charged as sexual abuse, the accusations against the defendant included that he wanted to put his fingers in the victim (again, Ecuadorean law does not limit rape to penetration by the sexual organ)); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("[The defendant] was charged with crimes involving murder under Yugoslavia law, and murder is the first enumerated extraditable offense in the treaty. [The defendant's] argument that his indictment in Yugoslavia for 'war crimes' falls outside the treaty 'is absurd and offensive.'"); And, as explained *infra*, the conduct of which McJohn is accused does not constitute the extraditable offense of rape under Chilean law.

30

added)); *United States v. Rauscher*, 119 U.S. 407 (1886) ("Indeed, the enumeration of offenses in most of these treaties . . . is so specific, and marked by such a clear line in regard to the magnitude and importance of those offenses, that it is impossible to give any other interpretation to it than that of the exclusion of the right of extradition for any others.").

Indeed, the absence of flexibility in interpreting the 1900 Treaty appears to have prompted in part the enactment of its successor, the 2013 Treaty. S. FOREIGN RELS. COMM., EXTRADITION TREATY WITH THE REPUBLIC OF CHILE, S. EXEC. DOC. NO. 114-10, at 2 (2016) (stating, "The treaty before the Senate is designed to replace, and thereby modernize, the century-old extradition treaty with Chile" and the "more flexible provision ensures that newly-enacted criminal offenses[17] are covered by the Treaty, thereby obviating the need to amend it as offenses are criminalized by the Parties.").

While it would be easier to abdicate its duty to interpret the treaty and to simply defer to Chile's and the United States's interpretation of the 1900 Treaty, this Court is charged with deciding whether the law authorizes extradition for the offenses with which McJohn is charged. 18 U.S.C. § 3184 (requiring the judge to certify extradition only if, after a hearing, he finds

---

[17] Article 365 bis, with which McJohn was charged, was added to the Chilean Criminal Code in 2004. Doc. 38-1 p. 3.

sufficient evidence that charges under a proper provision of the treaty are sustained). The plain language of the 1900 Treaty authorizes the extradition of a fugitive "charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties." The 1900 Treaty states that "rape" is such an offense.

McJohn is charged with committing sexual abuse and aggravated sexual abuse within the jurisdiction of the contracting party of Chile. He is neither charged with, nor alleged to have committed conduct that constitutes, "rape" within the jurisdiction of Chile. The 1900 Treaty does not authorize McJohn's extradition.

Because I find that McJohn is not subject to extradition under the 1900 Treaty, I need not consider whether probable cause supports his extradition (Docs. 1, 14), whether he may present additional evidence challenging the allegations against him (Doc. 20), or whether further detention is appropriate in this case (Doc. 3).

IV.    **Conclusion**

For the reasons above:

(1)    The United States' motion to certify the extradition of McJohn (Docs. 1, 14) is DENIED.

(2)    The United States' motion for detention pending extradition (Doc. 3) and motion in limine to exclude McJohn's evidence (Doc. 20) are DENIED AS MOOT.

(3)    Raymond McJohn shall be released from the custody of the United States Marshals Service.

(4)    The Clerk is directed to CLOSE this case.

DONE on November 24, 2025.

NATALIE HIRT ADAMS
United States Magistrate Judge

33